RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
*Plaintiff-Appellant*,

AIMEE STEPHENS,

*Intervenor*,

No. 16-2424

*v.*

R.G. &. G.R. HARRIS FUNERAL HOMES, INC.,
*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-13710—Sean F. Cox, District Judge.

Argued: October 4, 2017

Decided and Filed: March 7, 2018

Before: MOORE, WHITE, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Anne Noel Occhialino, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. John A. Knight, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Chicago, Illinois, for Intervenor. Douglas G. Wardlow, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellee. **ON BRIEF:** Anne Noel Occhialino, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. John A. Knight, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, Chicago, Illinois, Jay D. Kaplan, Daniel S. Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Intervenor. Douglas G. Wardlow, Gary S. McCaleb, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, for Appellee. Jennifer C. Pizer, Nancy C. Marcus, LAMBDA LEGAL DEFENSE AND

EDUCATION FUND, INC., Los Angeles, California, Gregory R. Nevins, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Atlanta, Georgia, Richard B. Katskee, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., Doron M. Kalir, CLEVELAND-MARSHALL COLLEGE OF LAW, Cleveland, Ohio, Elizabeth Reiner Platt, Katherine Franke, PRIVATE RIGHTS / PUBLIC CONSCIENCE PROJECT, New York, New York, Mary Jane Eaton, Wesley R. Powell, Sameer Advani, WILLKIE FARR & GALLAGHER, LLP, New York, New York, Eric Alan Isaacson, LAW OFFICE OF ERIC ALAN ISAACSON, La Jolla, California, William J. Olson, WILLIAM J. OLSON, P.C., Vienna, Virginia, for Amici Curiae.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Aimee Stephens (formerly known as Anthony Stephens) was born biologically male.[1] While living and presenting as a man, she worked as a funeral director at R.G. & G.R. Harris Funeral Homes, Inc. ("the Funeral Home"), a closely held for-profit corporation that operates three funeral homes in Michigan. Stephens was terminated from the Funeral Home by its owner and operator, Thomas Rost, shortly after Stephens informed Rost that she intended to transition from male to female and would represent herself and dress as a woman while at work. Stephens filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), which investigated Stephens's allegations that she had been terminated as a result of unlawful sex discrimination. During the course of its investigation, the EEOC learned that the Funeral Home provided its male public-facing employees with clothing that complied with the company's dress code while female public-facing employees received no such allowance. The EEOC subsequently brought suit against the Funeral Home in which the EEOC charged the Funeral Home with violating Title VII of the Civil Rights Act of 1964 ("Title VII") by (1) terminating Stephens's employment on the basis of her transgender or transitioning status and her refusal to conform to sex-based stereotypes; and (2) administering a discriminatory-clothing-allowance policy.

---

[1]We refer to Stephens using female pronouns, in accordance with the preference she has expressed through her briefing to this court.

The parties submitted dueling motions for summary judgment. The EEOC argued that it was entitled to judgment as a matter of law on both of its claims. For its part, the Funeral Home argued that it did not violate Title VII by requiring Stephens to comply with a sex-specific dress code that it asserts equally burdens male and female employees, and, in the alternative, that Title VII should not be enforced against the Funeral Home because requiring the Funeral Home to employ Stephens while she dresses and represents herself as a woman would constitute an unjustified substantial burden upon Rost's (and thereby the Funeral Home's) sincerely held religious beliefs, in violation of the Religious Freedom Restoration Act ("RFRA"). As to the EEOC's discriminatory-clothing-allowance claim, the Funeral Home argued that Sixth Circuit case law precludes the EEOC from bringing this claim in a complaint that arose out of Stephens's original charge of discrimination because the Funeral Home could not reasonably expect a clothing-allowance claim to emerge from an investigation into Stephens's termination.

The district court granted summary judgment in favor of the Funeral Home on both claims. For the reasons set forth below, we hold that (1) the Funeral Home engaged in unlawful discrimination against Stephens on the basis of her sex; (2) the Funeral Home has not established that applying Title VII's proscriptions against sex discrimination to the Funeral Home would substantially burden Rost's religious exercise, and therefore the Funeral Home is not entitled to a defense under RFRA; (3) even if Rost's religious exercise were substantially burdened, the EEOC has established that enforcing Title VII is the least restrictive means of furthering the government's compelling interest in eradicating workplace discrimination against Stephens; and (4) the EEOC may bring a discriminatory-clothing-allowance claim in this case because such an investigation into the Funeral Home's clothing-allowance policy was reasonably expected to grow out of the original charge of sex discrimination that Stephens submitted to the EEOC. Accordingly, we **REVERSE** the district court's grant of summary judgment on both the unlawful-termination and discriminatory-clothing-allowance claims, **GRANT** summary judgment to the EEOC on its unlawful-termination claim, and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND

Aimee Stephens, a transgender woman who was "assigned male at birth," joined the Funeral Home as an apprentice on October 1, 2007 and served as a Funeral Director/Embalmer at the Funeral Home from April 2008 until August 2013.  R. 51-18 (Stephens Dep. at 49–51) (Page ID #817); R. 61 (Def.'s Counter Statement of Disputed Facts ¶ 10) (Page ID #1828).  During the course of her employment at the Funeral Home, Stephens presented as a man and used her then-legal name, William Anthony Beasley Stephens.  R. 51-18 (Stephens Dep. at 47) (Page ID #816); R. 61 (Def.'s Counter Statement of Disputed Facts ¶ 15) (Page ID #1829).

The Funeral Home is a closely held for-profit corporation.  R. 55 (Def.'s Statement of Facts ¶ 1) (Page ID #1683).[2]  Thomas Rost ("Rost"), who has been a Christian for over sixty-five years, owns 95.4% of the company and operates its three funeral home locations.  *Id.* ¶¶ 4, 8, 17 (Page ID #1684–85); R. 54-2 (Rost Aff. ¶ 2) (Page ID #1326).  Rost proclaims "that God has called him to serve grieving people" and "that his purpose in life is to minister to the grieving."  R. 55 (Def.'s Statement of Facts ¶ 31) (Page ID #1688).  To that end, the Funeral Home's website contains a mission statement that states that the Funeral Home's "highest priority is to honor God in all that we do as a company and as individuals" and includes a verse of scripture on the bottom of the mission statement webpage.  *Id.* ¶¶ 21–22 (Page ID #1686).  The Funeral Home itself, however, is not affiliated with a church; it does not claim to have a religious purpose in its articles of incorporation; it is open every day, including Christian holidays; and it serves clients of all faiths.  R. 61 (Def.'s Counter Statement of Facts ¶¶ 25–27; 29–30) (Page ID #1832–34).  "Employees have worn Jewish head coverings when holding a Jewish funeral service."  *Id.* ¶ 31 (Page ID #1834).  Although the Funeral Home places the Bible, "Daily Bread" devotionals, and "Jesus Cards" in public places within the funeral homes, the Funeral Home does not decorate its rooms with "visible religious figures . . . to avoid offending people of different religions."  *Id.* ¶¶ 33–34 (Page ID #1834).  Rost hires employees belonging to any faith or no faith to work at the Funeral Home, and he "does not endorse or consider himself to endorse his employees' beliefs or non-employment-related activities."  *Id.* ¶¶ 37–38 (Page ID #1835).

---

[2]All facts drawn from Def.'s Statement of Facts (R. 55) are undisputed.  *See* R. 64 (Pl.'s Counter Statement of Disputed Facts) (Page ID #2066–88).

The Funeral Home requires its public-facing male employees to wear suits and ties and its public-facing female employees to wear skirts and business jackets. R. 55 (Def.'s Statement of Facts at ¶ 51) (Page ID #1691). The Funeral Home provides all male employees who interact with clients, including funeral directors, with free suits and ties, and the Funeral Home replaces suits as needed. R. 61 (Def.'s Counter Statement of Disputed Facts ¶¶ 42, 48) (Page ID #1836–37). All told, the Funeral Home spends approximately $470 per full-time employee per year and $235 per part-time employee per year on clothing for male employees. *Id.* ¶ 55 (Page ID #1839).

Until October 2014—after the EEOC filed this suit—the Funeral Home did not provide its female employees with any sort of clothing or clothing allowance. *Id.* ¶ 54 (Page ID #1838–39). Beginning in October 2014, the Funeral Home began providing its public-facing female employees with an annual clothing stipend ranging from $75 for part-time employees to $150 for full-time employees. *Id.* ¶ 54 (Page ID #1838–39). Rost contends that the Funeral Home would provide suits to all funeral directors, regardless of their sex, *id.*, but it has not employed a female funeral director since Rost's grandmother ceased working for the organization around 1950, R. 54-2 (Rost Aff. ¶¶ 52, 54) (Page ID #1336–37). According to Rost, the Funeral Home has received only one application from a woman for a funeral director position in the thirty-five years that Rost has operated the Funeral Home, and the female applicant was deemed not qualified. *Id.* ¶¶ 2, 53 (Page ID #1326, 1336).

On July 31, 2013, Stephens provided Rost with a letter stating that she has struggled with "a gender identity disorder" her "entire life," and informing Rost that she has "decided to become the person that [her] mind already is." R. 51-2 (Stephens Letter at 1) (Page ID #643). The letter stated that Stephens "intend[ed] to have sex reassignment surgery," and explained that "[t]he first step [she] must take is to live and work full-time as a woman for one year." *Id.* To that end, Stephens stated that she would return from her vacation on August 26, 2013, "as [her] true self, Amiee [sic] Australia Stephens, in appropriate business attire." *Id.* After presenting the letter to Rost, Stephens postponed her vacation and continued to work for the next two weeks. R. 68 (Reply to Def.'s Counter Statement of Material Facts Not in Dispute at 1) (Page ID #2122). Then, just before Stephens left for her intended vacation, Rost fired her. R. 61 (Def.'s Counter Statement of Disputed Facts ¶¶ 10–11) (Page ID #1828). Rost said, "this is not going to

work out," and offered Stephens a severance agreement if she "agreed not to say anything or do anything." R. 54-15 (Stephens Dep. at 75–76) Page ID #1455; R. 63-5 (Rost Dep. at 126–27) Page ID #1974. Stephens refused. *Id.* Rost testified that he fired Stephens because "he was no longer going to represent himself as a man. He wanted to dress as a woman." R. 51-3 (Rost 30(b)(6) Dep. at 135–36) (Page ID #667).

Rost avers that he "sincerely believe[s] that the Bible teaches that a person's sex is an immutable God-given gift," and that he would be "violating God's commands if [he] were to permit one of [the Funeral Home's] funeral directors to deny their sex while acting as a representative of [the] organization" or if he were to "permit one of [the Funeral Home's] male funeral directors to wear the uniform for female funeral directors while at work." R. 54-2 (Rost Aff. ¶¶ 42–43, 45) (Page ID #1334–35). In particular, Rost believes that authorizing or paying for a male funeral director to wear the uniform for female funeral directors would render him complicit "in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift." *Id.* ¶¶ 43, 45 (Page ID #1334–35).

After her employment was terminated, Stephens filed a sex-discrimination charge with the EEOC, alleging that "[t]he only explanation" she received from "management" for her termination was that "the public would [not] be accepting of [her] transition." R. 63-2 (Charge of Discrimination at 1) (Page ID #1952). She further noted that throughout her "entire employment" at the Funeral Home, there were "no other female Funeral Director/Embalmers." *Id.* During the course of investigating Stephens's allegations, the EEOC learned from another employee that the Funeral Home did not provide its public-facing female employees with suits or a clothing stipend. R. 54-24 (Memo for File at 9) (Page ID #1513).

The EEOC issued a letter of determination on June 5, 2014, in which the EEOC stated that there was reasonable cause to believe that the Funeral Home "discharged [Stephens] due to her sex and gender identity, female, in violation of Title VII" and "discriminated against its female employees by providing male employees with a clothing benefit which was denied to females, in violation of Title VII." R. 63-4 (Determination at 1) (Page ID #1968). The EEOC and the Funeral Home were unable to resolve this dispute through an informal conciliation

process, and the EEOC filed a complaint against the Funeral Home in the district court on September 25, 2014. R. 1 (Complaint) (Page ID #1–9).

The Funeral Home moved to dismiss the EEOC's action for failure to state a claim. The district court denied the Funeral Home's motion, but it narrowed the basis upon which the EEOC could pursue its unlawful-termination claim. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 100 F. Supp. 3d 594, 599, 603 (E.D. Mich. 2015). In particular, the district court agreed with the Funeral Home that transgender status is not a protected trait under Title VII, and therefore held that the EEOC could not sue for alleged discrimination against Stephens based solely on her transgender and/or transitioning status. *See id.* at 598–99. Nevertheless, the district court determined that the EEOC had adequately stated a claim for discrimination against Stephens based on the claim that she was fired because of her failure to conform to the Funeral Home's "sex- or gender-based preferences, expectations, or stereotypes." *Id.* at 599 (quoting R. 1 (Compl. ¶ 15) (Page ID #4–5)).

The parties then cross-moved for summary judgment. *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d 837, 840 (E.D. Mich. 2016). With regard to the Funeral Home's decision to terminate Stephens's employment, the district court determined that there was "direct evidence to support a claim of employment discrimination" against Stephens on the basis of her sex, in violation of Title VII. *Id.* at 850. However, the court nevertheless found in the Funeral Home's favor because it concluded that the Religious Freedom Restoration Act ("RFRA") precludes the EEOC from enforcing Title VII against the Funeral Home, as doing so would substantially burden Rost and the Funeral Home's religious exercise and the EEOC had failed to demonstrate that enforcing Title VII was the least restrictive way to achieve its presumably compelling interest "in ensuring that Stephens is not subject to gender stereotypes in the workplace in terms of required clothing at the Funeral home." *Id.* at 862–63. Based on its narrow conception of the EEOC's compelling interest in bringing the claim, the district court concluded that the EEOC could have achieved its goals by proposing that the Funeral Home impose a gender-neutral dress code. *Id.* The EEOC's failure to consider such an accommodation was, according to the district court, fatal to its case. *Id.* at 863. Separately, the district court held that it lacked jurisdiction to consider the EEOC's discriminatory-clothing-

allowance claim because, under longstanding Sixth Circuit precedent, the EEOC may pursue in a Title VII lawsuit only claims that are reasonably expected to grow out of the complaining party's—in this case, Stephens's—original charge. *Id.* at 864–70. The district court entered final judgment on all counts in the Funeral Home's favor on August 18, 2016, R. 77 (J.) (Page ID #2235), and the EEOC filed a timely notice of appeal shortly thereafter, *see* R. 78 (Notice of Appeal) (Page ID #2236–37).

Stephens moved to intervene in this appeal on January 26, 2017, after expressing concern that changes in policy priorities within the U.S. government might prevent the EEOC from fully representing Stephens's interests in this case. *See* D.E. 19 (Mot. to Intervene as Plaintiff-Appellant at 5–7). The Funeral Home opposed Stephens's motion on the grounds that the motion was untimely and Stephens had failed to show that the EEOC would not represent her interests adequately. D.E. 21 (Mem. in Opp'n at 2–11). We determined that Stephens's request was timely given that she previously "had no reason to question whether the EEOC would continue to adequately represent her interests" and granted Stephens's motion to intervene on March 27, 2017. D.E. 28-2 (Order at 2). We further determined that Stephens's intervention would not prejudice the Funeral Home because Stephens stated in her briefing that she did not intend to raise new issues. *Id.* Six groups of amici curiae also submitted briefing in this case.

## II. DISCUSSION

### A. Standard of Review

"We review a district court's grant of summary judgment de novo." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009) (quoting *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008)). Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In reviewing a grant of summary judgment, "we view all facts and any inferences in the light most favorable to the nonmoving party." *Risch*, 581 F.3d at 390 (citation omitted). We also review all "legal conclusions supporting [the district court's] grant of summary judgment *de novo*." *Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) (citation omitted).

**B. Unlawful Termination Claim**

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff can establish a *prima facie* case [of unlawful discrimination] by presenting direct evidence of discriminatory intent." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality opinion)). "[A] facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." *Id.* (citation omitted). Once a plaintiff establishes that "the prohibited classification played a motivating part in the [adverse] employment decision," the employer then bears the burden of proving that it would have terminated the plaintiff "even if it had not been motivated by impermissible discrimination." *Id.* (citing, *inter alia*, *Price Waterhouse*, 490 U.S. at 244–45).

Here, the district court correctly determined that Stephens was fired because of her failure to conform to sex stereotypes, in violation of Title VII. *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 850 ("[W]hile this Court does not often see cases where there is direct evidence to support a claim of employment discrimination, it appears to exist here."). The district court erred, however, in finding that Stephens could not alternatively pursue a claim that she was discriminated against on the basis of her transgender and transitioning status. Discrimination on the basis of transgender and transitioning status is necessarily discrimination on the basis of sex, and thus the EEOC should have had the opportunity to prove that the Funeral Home violated Title VII by firing Stephens because she is transgender and transitioning from male to female.

**1. Discrimination on the Basis of Sex Stereotypes**

In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a plurality of the Supreme Court explained that Title VII's proscription of discrimination "'*because of* . . . sex' . . . mean[s] that gender must be irrelevant to employment decisions." *Id.* at 240 (emphasis in original).

In enacting Title VII, the plurality reasoned, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Id.* at 251 (quoting *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).  The *Price Waterhouse* plurality, along with two concurring Justices, therefore determined that a female employee who faced an adverse employment decision because she failed to "walk . . . femininely, talk . . . femininely, dress . . . femininely, wear make-up, have her hair styled, [or] wear jewelry," could properly state a claim for sex discrimination under Title VII—even though she was not discriminated against for being a woman *per se*, but instead for failing to be womanly enough.  *See id.* at 235 (plurality opinion) (quoting *Hopkins v. Price Waterhouse*, 618 F. Supp. 1109, 1117 (D.D.C. 1985)); *id.* at 259 (White, J., concurring); *id.* at 272 (O'Connor, J., concurring).

Based on *Price Waterhouse*, we determined that "discrimination based on a failure to conform to stereotypical gender norms" was no less prohibited under Title VII than discrimination based on "the biological differences between men and women." *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004).  And we found no "reason to exclude Title VII coverage for non sex-stereotypical behavior simply because the person is a transsexual." *Id.* at 575.  Thus, in *Smith*, we held that a transgender plaintiff (born male) who suffered adverse employment consequences after "he began to express a more feminine appearance and manner on a regular basis" could file an employment discrimination suit under Title VII, *id.* at 572, because such "discrimination would not [have] occur[red] but for the victim's sex," *id.* at 574. As we reasoned in *Smith*, Title VII proscribes discrimination both against women who "do not wear dresses or makeup" and men who do. *Id.*  Under any circumstances, "[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination." *Id.* at 575.

Here, Rost's decision to fire Stephens because Stephens was "no longer going to represent himself as a man" and "wanted to dress as a woman," *see* R. 51-3 (Rost 30(b)(6) Dep. at 135–36) (Page ID #667), falls squarely within the ambit of sex-based discrimination that *Price Waterhouse* and *Smith* forbid.  For its part, the Funeral Home has failed to establish a non-discriminatory basis for Stephens's termination, and Rost admitted that he did not fire Stephens

for any performance-related issues. *See* R. 51-3 (Rost 30(b)(6) Dep. at 109, 136) (Page ID #663, 667). We therefore agree with the district court that the Funeral Home discriminated against Stephens on the basis of her sex, in violation of Title VII.

The Funeral Home nevertheless argues that it has not violated Title VII because sex stereotyping is barred only when "the employer's reliance on stereotypes . . . result[s] in disparate treatment of employees because they are either male or female." Appellee Br. at 31. According to the Funeral Home, an employer does not engage in impermissible sex stereotyping when it requires its employees to conform to a sex-specific dress code—as it purportedly did here by requiring Stephens to abide by the dress code designated for the Funeral Home's male employees—because such a policy "impose[s] equal burdens on men and women," and thus does not single out an employee for disparate treatment based on that employee's sex. *Id.* at 12. In support of its position, the Funeral Home relies principally on *Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104 (9th Cir. 2006) (en banc), and *Barker v. Taft Broadcasting Co.*, 549 F.2d 400 (6th Cir. 1977). *Jespersen* held that a sex-specific grooming code that imposed different but equally burdensome requirements on male and female employees would not violate Title VII. *See* 444 F.3d at 1109–11 (holding that the plaintiff failed to demonstrate how a grooming code that required women to wear makeup and banned men from wearing makeup was a violation of Title VII because the plaintiff failed to produce evidence showing that this sex-specific makeup policy was "more burdensome for women than for men"). *Barker*, for its part, held that a sex-specific grooming code that was enforced equally as to male and female employees would not violate Title VII. *See* 549 F.2d at 401 (holding that a grooming code that established different hair-length limits for male and female employees did not violate Title VII because failure to comply with the code resulted in the same consequences for men and women). For three reasons, the Funeral Home's reliance on these cases is misplaced.

First, the central issue in *Jespersen* and *Barker*—whether certain sex-specific appearance requirements violate Title VII—is not before this court. We are not considering, in this case, whether the Funeral Home violated Title VII by requiring men to wear pant suits and women to wear skirt suits. Our question is instead whether the Funeral Home could legally terminate Stephens, notwithstanding that she fully intended to comply with the company's sex-specific

dress code, simply because she refused to conform to the Funeral Home's notion of her sex. When the Funeral Home's actions are viewed in the proper context, no reasonable jury could believe that Stephens was not "target[ed] . . . for disparate treatment" and that "no sex stereotype factored into [the Funeral Home's] employment decision." *See* Appellee Br. at 19–20.

Second, even if we would permit certain sex-specific dress codes in a case where the issue was properly raised, we would not rely on either *Jespersen* or *Barker* to do so. *Barker* was decided before *Price Waterhouse,* and it in no way anticipated the Court's recognition that Title VII "strike[s] at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Price Waterhouse,* 490 U.S. at 251 (plurality) (quoting *Manhart,* 435 U.S. at 707 n.13). Rather, according to *Barker,* "[w]hen Congress makes it unlawful for an employer to 'discriminate . . . on the basis of . . . sex . . .', without further explanation of its meaning, we should not readily infer that it meant something different than what the concept of discrimination has traditionally meant." 549 F.2d at 401–02 (quoting *Gen. Elec. Co. v. Gilbert,* 429 U.S. 125, 145 (1976), *superseded by statute,* Pregnancy Discrimination Act of 1978, Pub. L. 95-555, 92 Stat. 2076, 52 U.S.C. § 2000e(k), *as recognized in Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 89 (1983)). Of course, this is precisely the sentiment that *Price Waterhouse* "eviscerated" when it recognized that "Title VII's reference to 'sex' encompasses both the biological differences between men and women, and gender discrimination, that is, discrimination based on a failure to conform to stereotypical gender norms." *Smith,* 378 F.3d at 573 (citing *Price Waterhouse,* 490 U.S. at 251). Indeed, *Barker*'s incompatibility with *Price Waterhouse* may explain why this court has not cited *Barker* since *Price Waterhouse* was decided.

As for *Jespersen,* that Ninth Circuit case is irreconcilable with our decision in *Smith.* Critical to *Jespersen*'s holding was the notion that the employer's "grooming standards," which required all female bartenders to wear makeup (and prohibited males from doing so), did not on their face violate Title VII because they did "not require [the plaintiff] to conform to a stereotypical image that would objectively impede her ability to perform her job." 444 F.3d at 1113. We reached the exact opposite conclusion in *Smith,* as we explained that requiring women to wear makeup does, in fact, constitute improper sex stereotyping. 378 F.3d at 574 ("After *Price Waterhouse,* an employer who discriminates against women because, for instance, they do

not wear dresses or makeup, is engaging in sex discrimination because the discrimination would not occur but for the victim's sex."). And more broadly, our decision in *Smith* forecloses the *Jespersen* court's suggestion that sex stereotyping is permissible so long as the required conformity does not "impede [an employee's] ability to perform her job," *Jespersen*, 444 F.3d at 1113, as the *Smith* plaintiff did not and was not required to allege that being expected to adopt a more masculine appearance and manner interfered with his job performance. *Jespersen*'s incompatibility with *Smith* may explain why it has never been endorsed (or even cited) by this circuit—and why it should not be followed now.

Finally, the Funeral Home misreads binding precedent when it suggests that sex stereotyping violates Title VII *only* when "the employer's sex stereotyping resulted in 'disparate treatment of men and women.'" Appellee Br. at 18 (quoting *Price Waterhouse*, 490 U.S. at 251).[3] This interpretation of Title VII cannot be squared with our holding in *Smith*. There, we did not ask whether transgender persons transitioning from male to female were treated differently than transgender persons transitioning from female to male. Rather, we considered whether a transgender person was being discriminated against based on "his failure to conform to sex stereotypes concerning how a man should look and behave." *Smith*, 378 F.3d at 572. It is apparent from both *Price Waterhouse* and *Smith* that an employer engages in unlawful discrimination even if it expects both biologically male and female employees to conform to certain notions of how each should behave. *See Zarda v. Altitude Express, Inc.*, — F.3d —, No. 15-3775, slip op. at 47 (2d Cir. Feb. 26, 2018) (en banc) (plurality) ("[T]he employer in *Price Waterhouse* could not have defended itself by claiming that it fired a gender-non-conforming man as well as a gender-non-conforming woman any more than it could persuasively argue that two wrongs make a right.").

---

[3]*See also* Appellee Br. at 16 ("It is a helpful exercise to think about *Price Waterhouse* and imagine that there was a dress code imposed which obligated Ms. Hopkins to wear a skirt while her male colleagues were obliged to wear pants. Had she simply been fired for wearing pants rather than a skirt, the case would have ended there— both sexes would have been equally burdened by the requirement to comply with their respective sex-specific standard. But what the firm could not do was fire her for being aggressive or macho when it was tolerating or rewarding the behavior among men—and when it did, it relied on a stereotype to treat her disparately from the men in the firm.").

In short, the Funeral Home's sex-specific dress code does not preclude liability under Title VII. Even if the Funeral Home's dress code does not itself violate Title VII—an issue that is not before this court—the Funeral Home may not rely on its policy to combat the charge that it engaged in improper sex stereotyping when it fired Stephens for wishing to appear or behave in a manner that contradicts the Funeral Home's perception of how she should appear or behave based on her sex. Because the EEOC has presented unrefuted evidence that unlawful sex stereotyping was "at least a motivating factor in the [Funeral Home's] actions," *see White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 238 (6th Cir. 2005) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)), and because we reject the Funeral Home's affirmative defenses (*see* Section II.B.3, *infra*), we **GRANT** summary judgment to the EEOC on its sex discrimination claim.

### 2. Discrimination on the Basis of Transgender/Transitioning Status

We also hold that discrimination on the basis of transgender and transitioning status violates Title VII. The district court rejected this theory of liability at the motion-to-dismiss stage, holding that "transgender or transsexual status is currently not a protected class under Title VII." *R.G. & G.R. Harris Funeral Homes, Inc.*, 100 F. Supp. 3d at 598. The EEOC and Stephens argue that the district court's determination was erroneous because Title VII protects against sex stereotyping and "transgender discrimination is based on the non-conformance of an individual's gender identity and appearance with sex-based norms or expectations"; therefore, "discrimination because of an individual's transgender status is *always* based on gender-stereotypes: the stereotype that individuals will conform their appearance and behavior—whether their dress, the name they use, or other ways they present themselves—to the sex assigned them at birth." Appellant Br. at 24; *see also* Intervenor Br. at 10–15. The Funeral Home, in turn, argues that Title VII does not prohibit discrimination based on a person's transgender or transitioning status because "sex," for the purposes of Title VII, "refers to a binary characteristic for which there are only two classifications, male and female," and "which classification arises in a person based on their chromosomally driven physiology and reproductive function." Appellee Br. at 26. According to the Funeral Home, transgender status

refers to "a person's self-assigned 'gender identity'" rather than a person's sex, and therefore such a status is not protected under Title VII. *Id.* at 26–27.

For two reasons, the EEOC and Stephens have the better argument. First, it is analytically impossible to fire an employee based on that employee's status as a transgender person without being motivated, at least in part, by the employee's sex. The Seventh Circuit's method of "isolat[ing] the significance of the plaintiff's sex to the employer's decision" to determine whether Title VII has been triggered illustrates this point. *See Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017). In *Hively*, the Seventh Circuit determined that Title VII prohibits discrimination on the basis of sexual orientation—a different question than the issue before this court—by asking whether the plaintiff, a self-described lesbian, would have been fired "if she had been a man married to a woman (or living with a woman, or dating a woman) and everything else had stayed the same." *Id.* If the answer to that question is no, then the plaintiff has stated a "paradigmatic sex discrimination" claim. *See id.* Here, we ask whether Stephens would have been fired if Stephens had been a woman who sought to comply with the women's dress code. The answer quite obviously is no. This, in and of itself, confirms that Stephens's sex impermissibly affected Rost's decision to fire Stephens.

The court's analysis in *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008), provides another useful way of framing the inquiry. There, the court noted that an employer who fires an employee because the employee converted from Christianity to Judaism has discriminated against the employee "because of religion," regardless of whether the employer feels any animus against either Christianity or Judaism, because "[d]iscrimination 'because of religion' easily encompasses discrimination because of a *change* of religion.'" *Id.* at 306 (emphasis in original). By the same token, discrimination "because of sex" inherently includes discrimination against employees because of a change in their sex. *See id.* at 307–08.[4]

---

[4]Moreover, discrimination because of a person's transgender, intersex, or sexually indeterminate status is no less actionable than discrimination because of a person's identification with two religions, an unorthodox religion, or no religion at all. And "religious identity" can be just as fluid, variable, and difficult to define as "gender identity"; after all, both have "a deeply personal, internal genesis that lacks a fixed external referent." Sue Landsittel, *Strange Bedfellows? Sex, Religion, and Transgender Identity Under Title VII*, 104 Nw. U. L. Rev. 1147, 1172 (2010) (advocating for "[t]he application of tests for religious identity to the problem of gender identity [because it] produces a more realistic, and therefore more appropriate, authentication framework than the current reliance on medical diagnoses and conformity with the gender binary").

Here, there is evidence that Rost at least partially based his employment decision on Stephens's desire to change her sex:  Rost justified firing Stephens by explaining that Rost "sincerely believes that 'the Bible teaches that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex,'" and "the Bible teaches that it is wrong for a biological male to deny his sex by dressing as a woman."[5] *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 848 (quoting R. 55 (Def.'s Statement of Facts ¶ 28) (Page ID #1687); R. 53-3 (Rost 30(b)(6) Dep. ¶ 44) (Page ID #936)). As amici point out in their briefing, such statements demonstrate that "Ms. Stephens's sex necessarily factored into the decision to fire her." Equality Ohio Br. at 12; *cf. Hively*, 853 F.3d at 359 (Flaum, J., concurring) (arguing discrimination against a female employee because she is a lesbian is necessarily "motivated, in part, by . . . the employee's sex" because the employer is discriminating against the employee "because she is (A) a woman who is (B) sexually attracted to women").

The Funeral Home argues that *Schroer*'s analogy is "structurally flawed" because, unlike religion, a person's sex cannot be changed; it is, instead, a biologically immutable trait. Appellee Br. at 30.  We need not decide that issue; even if true, the Funeral Home's point is immaterial.  As noted above, the Supreme Court made clear in *Price Waterhouse* that Title VII requires "gender [to] be irrelevant to employment decisions."  490 U.S. at 240.  Gender (or sex) is not being treated as "irrelevant to employment decisions" if an employee's attempt or desire to change his or her sex leads to an adverse employment decision.

Second, discrimination against transgender persons necessarily implicates Title VII's proscriptions against sex stereotyping.  As we recognized in *Smith*, a transgender person is someone who "fails to act and/or identify with his or her gender"—i.e., someone who is inherently "gender non-conforming."  378 F.3d at 575; *see also id.* at 568 (explaining that

---

[5]On the other hand, there is also evidence that Stephens was fired only because of her nonconforming appearance and behavior at work, and not because of her transgender identity.  *See* R. 53-6 (Rost Dep. at 136–37) (Page ID #974) (At his deposition, when asked whether "the reason you fired [Stephens], was it because [Stephens] claimed that he was really a woman; is that why you fired [Stephens] or was it because he claimed – or that he would no longer dress as a man," Rost answered: "That he would no longer dress as a man," and when asked, "if Stephens had told you that he believed that he was a woman, but would only present as a woman outside of work, would you have terminated him," Rost answered: "No.").

transgender status is characterized by the American Psychiatric Association as "a disjunction between an individual's sexual organs and sexual identity"). Thus, an employer cannot discriminate on the basis of transgender status without imposing its stereotypical notions of how sexual organs and gender identity ought to align. There is no way to disaggregate discrimination on the basis of transgender status from discrimination on the basis of gender non-conformity, and we see no reason to try.

We did not expressly hold in *Smith* that discrimination on the basis of transgender status is unlawful, though the opinion has been read to say as much—both by this circuit and others. In *G.G. v. Gloucester County School Board*, 654 F. App'x 606 (4th Cir. 2016), for instance, the Fourth Circuit described *Smith* as holding "that discrimination against a transgender individual based on that person's transgender status is discrimination because of sex under federal civil rights statutes." *Id.* at 607. And in *Dodds v. United States Department of Education*, 845 F.3d 217 (6th Cir. 2016), we refused to stay "a preliminary injunction ordering the school district to treat an eleven-year old transgender girl as a female and permit her to use the girls' restroom" because, among other things, the school district failed to show that it would likely succeed on the merits. *Id.* at 220–21. In so holding, we cited *Smith* as evidence that this circuit's "settled law" prohibits "[s]ex stereotyping based on a person's gender non-conforming behavior," *id.* at 221 (second quote quoting *Smith*, 378 F.3d at 575), and then pointed to out-of-circuit cases for the propositions that "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes," *id.* (citing *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011)), and "[t]he weight of authority establishes that discrimination based on transgender status is already prohibited by the language of federal civil rights statutes," *id.* (quoting *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 729 (4th Cir.) (Davis, J., concurring), *cert. granted in part*, 137 S. Ct. 369 (2016), *and vacated and remanded*, 137 S. Ct. 1239 (2017).[6] Such references support what we now directly hold: Title VII protects

---

[6]We acknowledge that *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005), read *Smith* as focusing on "look and behav[ior]." *Id.* at 737 ("By alleging that his failure to conform to sex stereotypes concerning how a man should look and behave was the driving force behind defendant's actions, Smith stated a claim for relief pursuant to Title VII's prohibition of sex discrimination."). That is not surprising, however, given that only "look and behavior," not status, were at issue in *Barnes*.

transgender persons because of their transgender or transitioning status, because transgender or transitioning status constitutes an inherently gender non-conforming trait.

The Funeral Home raises several arguments against this interpretation of Title VII, none of which we find persuasive. First, the Funeral Home contends that the Congress enacting Title VII understood "sex" to refer only to a person's "physiology and reproductive role," and not a person's "self-assigned 'gender identity.'" Appellee Br. at 25–26. But the drafters' failure to anticipate that Title VII would cover transgender status is of little interpretive value, because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see also Zarda*, slip op. at 24–29 (majority opinion) (rejecting the argument that Title VII was not originally intended to protect employees against discrimination on the basis of sexual orientation, in part because the same argument "could also be said of multiple forms of discrimination that are [now] indisputably prohibited by Title VII . . . [but] were initially believed to fall outside the scope of Title VII's prohibition," such as "sexual harassment and hostile work environment claims"). And in any event, *Smith* and *Price Waterhouse* preclude an interpretation of Title VII that reads "sex" to mean only individuals' "chromosomally driven physiology and reproductive function." *See* Appellee Br. at 26. Indeed, we criticized the district court in *Smith* for "relying on a series of pre-*Price Waterhouse* cases from other federal appellate courts holding that transsexuals, as a class, are not entitled to Title VII protection because 'Congress had a narrow view of sex in mind' and 'never considered nor intended that [Title VII] apply to anything other than the traditional concept of sex.'" 378 F.3d at 572 (quoting *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984)) (alteration in original). According to *Smith*, such a limited view of Title VII's protections had been "eviscerated by *Price Waterhouse*." *Id.* at 573. The Funeral Home's attempt to resurrect the reasoning of these earlier cases thus runs directly counter to *Smith*'s holding.

In a related argument, the Funeral Home notes that both biologically male and biologically female persons may consider themselves transgender, such that transgender status is not unique to one biological sex. Appellee Br. at 27–28. It is true, of course, that an individual's

biological sex does not dictate her transgender status; the two traits are not coterminous. But a trait need not be exclusive to one sex to nevertheless be a function of sex. As the Second Circuit explained in *Zarda*,

> Title VII does not ask whether a particular sex is discriminated against; it asks whether a particular "*individual*" is discriminated against "because of such *individual's* . . . sex." Taking individuals as the unit of analysis, the question is not whether discrimination is borne only by men or only by women or even by both men and women; instead, the question is whether an individual is discriminated against because of his or her sex.

Slip op. at 46 n.23 (plurality opinion) (emphasis in original) (quoting 42 U.S.C. § 2000e-2(a)(1)). Because an employer cannot discriminate against an employee for being transgender without considering that employee's biological sex, discrimination on the basis of transgender status necessarily entails discrimination on the basis of sex—no matter what sex the employee was born or wishes to be. By the same token, an employer need not discriminate based on a trait common to all men or women to violate Title VII. After all, a subset of both women and men decline to wear dresses or makeup, but discrimination against any woman on this basis would constitute sex discrimination under *Price Waterhouse*. *See Hively*, 853 F.3d at 346 n.3 ("[T]he Supreme Court has made it clear that a policy need not affect *every* woman [or every man] to constitute sex discrimination. . . . A failure to discriminate against all women does not mean that an employer has not discriminated against one woman on the basis of sex.").

Nor can much be gleaned from the fact that later statutes, such as the Violence Against Women Act, expressly prohibit discrimination on the basis of "gender identity," while Title VII does not, *see* Appellee Br. at 28, because "Congress may certainly choose to use both a belt and suspenders to achieve its objectives," *Hively*, 853 F.3d at 344; *see also Yates v. United States*, 135 S. Ct. 1074, 1096 (2015) (Kagan, J., dissenting) (noting presence of two overlapping provisions in a statute "may have reflected belt-and-suspenders caution"). We have, in fact, already read Title VII to provide redundant statutory protections in a different context. In *In re Rodriguez*, 487 F.3d 1001 (6th Cir. 2007), for instance, we recognized that claims alleging discrimination on the basis of ethnicity may fall within Title VII's prohibition on discrimination on the basis of national origin, *see id.* at 1006 n.1, even though at least one other federal statute treats "national origin" and "ethnicity" as separate traits, *see* 20 U.S.C. § 1092(f)(1)(F)(ii).

Moreover, Congress's failure to modify Title VII to include expressly gender identity "lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction, 'including the inference that the existing legislation already incorporated the offered change.'" *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)). In short, nothing precludes discrimination based on transgender status from being viewed both as discrimination based on "gender identity" for certain statutes and, for the purposes of Title VII, discrimination on the basis of sex.

The Funeral Home places great emphasis on the fact that our published decision in *Smith* superseded an earlier decision that stated explicitly, as opposed to obliquely, that a plaintiff who "alleges discrimination based solely on his identification as a transsexual . . . has alleged a claim of sex stereotyping pursuant to Title VII." *Smith v. City of Salem*, 369 F.3d 912, 922 (6th Cir.), *opinion amended and superseded*, 378 F.3d 566 (6th Cir. 2004). But such an amendment does not mean, as the Funeral Home contends, that the now-binding *Smith* opinion "directly rejected" the notion that Title VII prohibits discrimination on the basis of transgender status. *See* Appellee Br. at 31. The elimination of the language, which was not necessary to the decision, simply means that *Smith* did not expressly recognize Title VII protections for transgender persons based on identity. But *Smith*'s reasoning still leads us to the same conclusion.

We are also unpersuaded that our decision in *Vickers v. Fairfield Medical Center*, 453 F.3d 757 (6th Cir. 2006), precludes the holding we issue today. We held in *Vickers* that a plaintiff cannot pursue a claim for impermissible sex stereotyping on the ground that his perceived sexual orientation fails to conform to gender norms unless he alleges that he was discriminated against for failing to "conform to traditional gender stereotypes in any observable way at work." *Id.* at 764. *Vickers* thus rejected the notion that "the act of identification with a particular group, in itself, is sufficiently gender non-conforming such that an employee who so identifies would, by this very identification, engage in conduct that would enable him to assert a successful sex stereotyping claim." *Id.* The *Vickers* court reasoned that recognizing such a claim would impermissibly "bootstrap protection for sexual orientation into Title VII." *Id.* (quoting *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005)). The Funeral Home insists that, under *Vickers*, Stephens's sex-stereotyping claim survives only to the extent that it

concerns her "appearance or mannerisms on the job," *see id.* at 763, but not as it pertains to her underlying status as a transgender person.

The Funeral Home is wrong. First, *Vickers* does not control this case because *Vickers* concerned a different legal question. As the EEOC and amici Equality Ohio note, *Vickers* "addressed only whether Title VII forbids sexual orientation discrimination, not discrimination against a transgender individual." Appellant Br. at 30; *see also* Equality Ohio Br. at 16 n.7. While it is indisputable that "[a] panel of this Court cannot overrule the decision of another panel" when the "prior decision [constitutes] controlling authority," *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 689 (6th Cir. 1985)), one case is not "controlling authority" over another if the two address substantially different legal issues, *cf. Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 608 (6th Cir. 1996) (noting two panel decisions that "on the surface may appear contradictory" were reconcilable because "the result [in both cases wa]s heavily fact driven"). After all, we do not overrule a case by distinguishing it.

Second, we are not bound by *Vickers* to the extent that it contravenes *Smith*. *See Darrah*, 255 F.3d at 310 ("[W]hen a later decision of this court conflicts with one of our prior published decisions, we are still bound by the holding of the earlier case."). As noted above, *Vickers* indicated that a sex-stereotyping claim is viable under Title VII only if a plaintiff alleges that he was discriminated against for failing to "conform to traditional gender stereotypes *in any observable way at work*." 453 F.3d at 764 (emphasis added). The *Vickers* court's new "observable-at-work" requirement is at odds with the holding in *Smith*, which did not limit sex-stereotyping claims to traits that are observable in the workplace. The "observable-at-work" requirement also contravenes our reasoning in *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005)—a binding decision that predated *Vickers* by more than a year—in which we held that a reasonable jury could conclude that a transgender plaintiff was discriminated against on the basis of his sex when, among other factors, his "ambiguous sexuality and his practice of dressing as a woman *outside of work* were well-known within the [workplace]." *Id.* at 738 (emphasis

added).[7]  From *Smith* and *Barnes*, it is clear that a plaintiff may state a claim under Title VII for discrimination based on gender nonconformance that is expressed outside of work.  The *Vickers* court's efforts to develop a narrower rule are therefore not binding in this circuit.

Therefore, for the reasons set forth above, we hold that the EEOC could pursue a claim under Title VII on the ground that the Funeral Home discriminated against Stephens on the basis of her transgender status and transitioning identity.  The EEOC should have had the opportunity, either through a motion for summary judgment or at trial, to establish that the Funeral Home violated Title VII's prohibition on discrimination on the basis of sex by firing Stephens because she was transgender and transitioning from male to female.

### 3.  Defenses to Title VII Liability

Having determined that the Funeral Home violated Title VII's prohibition on sex discrimination, we must now consider whether any defenses preclude enforcement of Title VII in this case.  As noted above, the district court held that the EEOC's enforcement efforts must give way to the Religious Freedom Restoration Act ("RFRA"), which prohibits the government from enforcing a religiously neutral law against an individual if that law substantially burdens the individual's religious exercise and is not the least restrictive way to further a compelling government interest.  *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 857–64.  The EEOC seeks reversal of this decision; the Funeral Home urges affirmance.  In addition, certain amici ask us to affirm the district court's grant of summary judgment on different grounds— namely that Stephens falls within the "ministerial exception" to Title VII and is therefore not protected under the Act.  *See* Public Advocate Br. at 20–24.

---

[7]Oddly, the *Vickers* court appears to have recognized that its new "observable-at-work" requirement cannot be squared with earlier precedent.  Immediately after announcing this new requirement, the *Vickers* court cited *Smith* for the proposition that "a plaintiff hoping to succeed on a claim of sex stereotyping [must] show that he 'fails to act *and/or identify with* his or her gender'"—a proposition that is necessarily broader than the narrow rule *Vickers* sought to announce.  453 F.3d at 764 (citing *Smith*, 378 F.3d at 575) (emphasis added).  The *Vickers* court also seemingly recognized *Barnes* as binding authority, *see id.* (citing *Barnes*), but portrayed the decision as "affirming [the] district court's denial of defendant's motion for summary judgment as a matter of law on discrimination claim where pre-operative male-to-female transsexual was demoted based on his 'ambiguous sexuality and his practice of dressing as a woman' and his co-workers' assertions that he was 'not sufficiently masculine.'" *Id.*  This summary is accurate as far as it goes, but it entirely omits the discussion in *Barnes* of discrimination against the plaintiff based on "his practice of dressing as a woman *outside of work*."  401 F.3d at 738 (emphasis added).

We hold that the Funeral Home does not qualify for the ministerial exception to Title VII; the Funeral Home's religious exercise would not be substantially burdened by continuing to employ Stephens without discriminating against her on the basis of sex stereotypes; the EEOC has established that it has a compelling interest in ensuring the Funeral Home complies with Title VII; and enforcement of Title VII is necessarily the least restrictive way to achieve that compelling interest. We therefore **REVERSE** the district court's grant of summary judgment in the Funeral Home's favor and **GRANT** summary judgment to the EEOC on the unlawful-termination claim.

### a. Ministerial Exception

We turn first to the "ministerial exception" to Title VII, which is rooted in the First Amendment's religious protections, and which "preclude[s] application of [employment discrimination laws such as Title VII] to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). "[I]n order for the ministerial exception to bar an employment discrimination claim, the employer must be a religious institution and the employee must have been a ministerial employee." *Conlon v. InterVarsity Christian Fellowship/USA*, 777 F.3d 829, 833 (6th Cir. 2015) (quoting *Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 225 (6th Cir. 2007)). "The ministerial exception is a highly circumscribed doctrine. It grew out of the special considerations raised by the employment claims of clergy, which 'concern[] internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law.'" *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 409 (6th Cir. 2010) (quoting *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986)) (alteration in original).

Public Advocate of the United States and its fellow amici argue that the ministerial exception applies in this case because (1) the exception applies both to religious and non-religious entities, and (2) Stephens is a ministerial employee. Public Advocate Br. at 20–24. Tellingly, however, the Funeral Home contends that the Funeral Home "is not a religious organization" and therefore, "the ministerial exception has no application" to this case. Appellee Br. at 35. Although the Funeral Home has not waived the ministerial-exception defense by failing to raise it, *see Conlon*, 777 F.3d at 836 (holding that private parties may not "waive

the First Amendment's ministerial exception" because "[t]his constitutional protection is . . . structural"), we agree with the Funeral Home that the exception is inapplicable here.

As we made clear in *Conlon*, the ministerial exception applies only to "religious institution[s]." *Id.* at 833.  While an institution need not be "a church, diocese, or synagogue, or an entity operated by a traditional religious organization," *id.* at 834 (quoting *Hollins*, 474 F.3d at 225), to qualify for the exception, the institution must be "marked by clear or obvious religious characteristics," *id.* at 834 (quoting *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004)).  In accordance with these principles, we have previously determined that the InterVarsity Christian Fellowship/USA ("IVCF"), "an evangelical campus mission," constituted a religious organization for the purposes of the ministerial exception.  *See id.* at 831, 833.  IVCF described itself on its website as "faith-based religious organization" whose "purpose 'is to establish and advance at colleges and universities witnessing communities of students and faculty who follow Jesus as Savior and Lord.'" *Id.* at 831 (citation omitted).  In addition, IVCF's website notified potential employees that it has the right to "hir[e] staff based on their religious beliefs so that all staff share the same religious commitment." *Id.* (citation omitted).  Finally, IVCF required all employees "annually [to] reaffirm their agreement with IVCF's Purpose Statement and Doctrinal Basis." *Id.*

The Funeral Home, by comparison, has virtually no "religious characteristics."  Unlike the campus mission in *Conlon*, the Funeral Home does not purport or seek to "establish and advance" Christian values. *See id.*  As the EEOC notes, the Funeral Home "is not affiliated with any church; its articles of incorporation do not avow any religious purpose; its employees are not required to hold any particular religious views; and it employs and serves individuals of all religions."  Appellant Reply Br. at 33–34 (citing R. 61 (Def.'s Counter Statement of Disputed Facts ¶¶ 25–27, 30, 37) (Page ID #1832–35)).  Though the Funeral Home's mission statement declares that "its highest priority is to honor God in all that we do as a company and as individuals," R. 55 (Def.'s Statement of Facts ¶ 21) (Page ID #1686), the Funeral Home's sole public displays of faith, according to Rost, amount to placing "Daily Bread" devotionals and "Jesus Cards" with scriptural references in public places in the funeral homes, which clients may pick up if they wish, *see* R. 51-3 (Rost 30(b)(6) Dep. at 39–40) (Page ID #652).  The Funeral

Home does not decorate its rooms with "religious figures" because it does not want to "offend[] people of different religions." R. 61 (Def.'s Counter Statement of Disputed Facts ¶ 33) (Page ID # 1834). The Funeral Home is open every day, including on Christian holidays. *Id.* at 88–89 (Page ID #659–60). And while the employees are paid for federally recognized holidays, Easter is not a paid holiday. *Id.* at 89 (Page ID #660).

Nor is Stephens a "ministerial employee" under *Hosanna-Tabor*. Following *Hosanna-Tabor*, we have identified four factors to assist courts in assessing whether an employee is a minister covered by the exception: (1) whether the employee's title "conveys a religious—as opposed to secular—meaning"; (2) whether the title reflects "a significant degree of religious training" that sets the employee "apart from laypersons"; (3) whether the employee serves "as an ambassador of the faith" and serves a "leadership role within [the] church, school, and community"; and (4) whether the employee performs "important religious functions . . . for the religious organization." *Conlon*, 777 F.3d at 834–35. Stephens's title—"Funeral Director"— conveys a purely secular function. The record does not reflect that Stephens has any religious training. Though Stephens has a public-facing role within the funeral home, she was not an "ambassador of [any] faith," and she did not perform "important religious functions," *see id.* at 835; rather, Rost's description of funeral directors' work identifies mostly secular tasks—making initial contact with the deceased's families, handling the removal of the remains to the funeral home, introducing other staff to the families, coaching the families through the first viewing, greeting the guests, and coordinating the families' "final farewell," R. 53-3 (Rost Aff. ¶¶ 14–33) (Page ID #930–35). The only responsibilities assigned to Stephens that could be construed as religious in nature were, "on limited occasions," to "facilitate" a family's clergy selection, "facilitate the first meeting of clergy and family members," and "play a role in building the family's confidence around the role the clergy will play, clarifying what type of religious message is desired, and integrating the clergy into the experience." *Id.* ¶ 20 (Page ID #932–33). Such responsibilities are a far cry from the duties ascribed to the employee in *Conlon*, which "included assisting others to cultivate 'intimacy with God and growth in Christ-like character through personal and corporate spiritual disciplines.'" 777 F.3d at 832. In short, Stephens was not a ministerial employee and the Funeral Home is not a religious institution, and therefore the ministerial exception plays no role in this case.

**b.  Religious Freedom Restoration Act**

Congress enacted RFRA in 1993 to resurrect and broaden the Free Exercise Clause jurisprudence that existed before the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which overruled the approach to analyzing Free Exercise Clause claims set forth by *Sherbert v. Verner*, 374 U.S. 398 (1963).  *See City of Boerne v. Flores*, 521 U.S. 507, 511–15 (1997).  To that end, RFRA precludes the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb–1.  RFRA thus contemplates a two-step burden-shifting analysis:  First, a claimant must demonstrate that complying with a generally applicable law would substantially burden his religious exercise. Upon such a showing, the government must then establish that applying the law to the burdened individual is the least restrictive means of furthering a compelling government interest.

The questions now before us are whether (1) we ought to remand this case and preclude the Funeral Home from asserting a RFRA-based defense in the proceedings below because Stephens, a non-governmental party, joined this action as an intervenor on appeal; (2) if not, whether the Funeral Home adequately demonstrated that it would be substantially burdened by the application of Title VII in this case; (3) if so, whether the EEOC nevertheless demonstrated that application of a such a burden to the Funeral Home furthers a compelling governmental interest; and (4) if so, whether the application of such a burden constitutes the least restrictive means of furthering that compelling interest.  We address each inquiry in turn.

**i.  Applicability of the Religious Freedom Restoration Act**

We have previously made clear that "Congress intended RFRA to apply only to suits in which the government is a party."  *Seventh-Day Adventists*, 617 F.3d at 410.  Thus, if Stephens had initiated a private lawsuit against the Funeral Home to vindicate her rights under Title VII, the Funeral Home would be unable to invoke RFRA as a defense because the government would not have been party to the suit.  *See id.*  Now that Stephens has intervened in this suit, she argues

that the case should be remanded to the district court with instructions barring the Funeral Home from asserting a RFRA defense to her individual claims. Intervenor Br. at 15. The EEOC supports Stephens's argument. EEOC Reply Br. at 31.

The Funeral Home, in turn, argues that the question of RFRA's applicability to Title VII suits between private parties "is a new and complicated issue that has never been a part of this case and has never been briefed by the parties." Appellee Br. at 34. Because Stephens's intervention on appeal was granted, in part, on her assurances that she "seeks only to raise arguments already within the scope of this appeal," D.E. 23 (Stephens Reply in Support of Mot. to Intervene at 8); *see also* D.E. 28-2 (March 27, 2017 Order at 2), the Funeral Home insists that permitting Stephens to argue now in favor of remand "would immensely prejudice the Funeral Home and undermine the Court's reasons for allowing Stephens's intervention in the first place," Appellee Br. at 34–35 (citing *Illinois Bell Tel. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990)).

The Funeral Home is correct. Stephens's reply brief in support of her motion to intervene insists that "no party to an appeal may broaden the scope of litigation beyond the issues raised before the district court." D.E. 23 (Stephens Reply in Support of Mot. to Intervene at 8) (citing *Thomas v. Arn*, 474 U.S. 140, 148 (1985)). Though the district court noted in a footnote that "the Funeral Home could not assert a RFRA defense if Stephens had filed a Title VII suit on Stephens's own behalf," *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 864 n.23, this argument was not briefed by the parties at the district-court level. Thus, in accordance with Stephens's own brief, she should not be permitted to argue for remand before this court.

Stephens nevertheless insists that "intervenors . . . are permitted to present different arguments related to the principal parties' claims." Intervenor Reply Br. at 14 (citing *Grutter v. Bollinger*, 188 F.3d 394, 400–01 (6th Cir. 1999)). But in *Grutter*, this court determined that proposed intervenors ought to be able to present particular "defenses of affirmative action" that the principal party to the case (a university) might be disinclined to raise because of "internal and external institutional pressures." 188 F.3d at 400. Allowing intervenors to present particular defenses on the merits to judiciable claims is different than allowing intervenors to change the procedural course of litigation by virtue of their intervention.

Moreover, we typically will not consider issues raised for the first time on appeal unless they are "presented with sufficient clarity and completeness and [their] resolution will materially advance the process of th[e] . . . litigation." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988) (citation omitted). The merits of a remand have been addressed only in passing by the parties, and thus have not been discussed with "sufficient clarity and completeness" to enable us to entertain Stephens's claim.[8]

### ii. Prima Facie Case Under RFRA

To assert a viable defense under RFRA, a religious claimant must demonstrate that the government action at issue "would (1) substantially burden (2) a sincere (3) religious exercise." *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006). In reviewing such a claim, courts must not evaluate whether asserted "religious beliefs are mistaken or insubstantial." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2779 (2014). Rather, courts must assess "whether the line drawn reflects 'an honest conviction.'" *Id.* (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981)). In addition, RFRA, as amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

The EEOC argues that the Funeral Home's RFRA defense must fail because "RFRA protects religious exercise, not religious beliefs," Appellant Br. at 41, and the Funeral Home has failed to "identif[y] how continuing to employ Stephens after, or during, her transition would interfere with any religious 'action or practice,'" *id.* at 43 (quoting *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008)). The Funeral Home, in turn, contends that the "very operation of [the Funeral Home] constitutes protected religious exercise" because Rost feels

---

[8]For a similar reason, we decline to consider the argument raised by several amici that reading RFRA to "permit a religious accommodation that imposes material costs on third parties or interferes with the exercise of rights held by others" would violate the Establishment Clause of the First Amendment. *See* Private Rights/Public Conscience Br. at 15; *see also id.* at 5–15; Americans United Br. at 6–15. Amici may not raise "issues or arguments [that] . . . 'exceed those properly raised by the parties.'" *Shoemaker v. City of Howell*, 795 F.3d 553, 562 (6th Cir. 2015) (quoting *Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 433 (6th Cir. 1998)). Although Stephens notes that the Establishment Clause "requires the government and courts to account for the harms a religious exemption to Title VII would impose on employees," Intervenor Br. at 26, no party to this action presses the broad constitutional argument that amici seek to present. We therefore will not address the merits of amici's position.

compelled by his faith to "serve grieving people" through the funeral home, and thus "[r]equiring [the Funeral Home] to authorize a male funeral director to wear the uniform for female funeral directors would directly interfere with—and thus impose a substantial burden on—[the Funeral Home's] ability to carry out Rost's religious exercise of caring for the grieving." Appellee Br. at 38.

If we take Rost's assertions regarding his religious beliefs as sincere, which all parties urge us to do, then we must treat Rost's running of the funeral home as a religious exercise—even though Rost does not suggest that ministering to grieving mourners by operating a funeral home is a tenet of his religion, more broadly. *See United States v. Sterling*, 75 M.J. 407, 415 (C.A.A.F. 2016) (noting that conduct that "was claimed to be religiously motivated at least in part . . . falls within RFRA's expansive definition of 'religious exercise'"), *cert. denied*, 137 S. Ct. 2212 (2017). The question then becomes whether the Funeral Home has identified any way in which continuing to employ Stephens would substantially burden Rost's ability to serve mourners. The Funeral Home purports to identify two burdens. "First, allowing a funeral director to wear the uniform for members of the opposite sex would often create distractions for the deceased's loved ones and thereby hinder their healing process (and [the Funeral Home's] ministry)," and second, "forcing [the Funeral Home] to violate Rost's faith . . . would significantly pressure Rost to leave the funeral industry and end his ministry to grieving people." Appellee Br. at 38. Neither alleged burden is "substantial" within the meaning of RFRA.

The Funeral Home's first alleged burden—that Stephens will present a distraction that will obstruct Rost's ability to serve grieving families—is premised on presumed biases. As the EEOC observes, the Funeral Home's argument is based on "a view that Stephens is a 'man' and would be perceived as such even after her gender transition," as well as on the "assumption that a transgender funeral director would so disturb clients as to 'hinder healing.'" Appellant Reply Br. at 19. The factual premises underlying this purported burden are wholly unsupported in the record. Rost testified that he has never seen Stephens in anything other than a suit and tie and does not know how Stephens would have looked when presenting as a woman. R. 54-5 (Rost 30(b)(6) Dep. at 60–61) (Page ID #1362). Rost's assertion that he believes his clients would be disturbed by Stephens's appearance during and after her transition to the point that their healing

from their loved ones' deaths would be hindered, *see* R. 55 (Def.'s Statement of Facts ¶ 78) (Page ID #1697), at the very least raises a material question of fact as to whether his clients would actually be distracted, which cannot be resolved in the Funeral Home's favor at the summary-judgment stage. *See Tree of Life Christian Sch. v. City of Upper Arlington*, 823 F.3d 365, 371–72 (6th Cir. 2016) (holding that this court "cannot *assume* . . . a fact" at the summary judgment stage); *see also Guess? Inc. v. United States*, 944 F.2d 855, 858 (Fed. Cir. 1991) (in case where manufacturer's eligibility for certain statutory refund on import tariffs turned on whether foreign customers preferred U.S.-made jeans more than foreign-made jeans, court held that the manufacturer's averred *belief* regarding foreign customers' preferences was not conclusive; instead, there remained a genuine dispute of material fact as to foreign customers' *actual* preferences). Thus, even if we were to find the Funeral Home's argument legally cognizable, we would not affirm a finding of substantial burden based on a contested and unsupported assertion of fact.

But more to the point, we hold as a matter of law that a religious claimant cannot rely on customers' presumed biases to establish a substantial burden under RFRA. Though we have seemingly not had occasion to address the issue, other circuits have considered whether and when to account for customer biases in justifying discriminatory employment practices. In particular, courts asked to determine whether customers' biases may render sex a "bona fide occupational qualification" under Title VII have held that "it would be totally anomalous . . . to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid." *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 389 (5th Cir. 1971); *see also Bradley v. Pizzaco of Nebraska, Inc.*, 7 F.3d 795, 799 (8th Cir. 1993) (holding grooming policy for pizza deliverymen that had disparate impact on African-American employees was not justified by customer preferences for clean-shaven deliverymen because "[t]he existence of a beard on the face of a delivery man does not affect in any manner Domino's ability to make or deliver pizzas to their customers"); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir. 1981) (rejecting claim that promoting a female employee would "'destroy the essence' of [the defendant's] business"—a theory based on the premise that South American clients would not want to work with a female vice-president—because biased customer preferences did not make being a man a "bona fide occupational qualification" for the position at

issue).  District courts within this circuit have endorsed these out-of-circuit opinions.  *See, e.g.,* *Local 567 Am. Fed'n of State, Cty., & Mun. Emps. v. Mich. Council 25, Am. Fed'n of State, Cty., & Mun. Emps.*, 635 F. Supp. 1010, 1012 (E.D. Mich. 1986) (citing *Diaz*, 442 F.2d 385, and *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969), for the proposition that "[a]ssertions of sex-based employee classification cannot be made on the basis of stereotypes or customer preferences").

Of course, cases like *Diaz*, *Fernandez*, and *Bradley* concern a different situation than the one at hand.  We could agree that courts should not credit customers' prejudicial notions of what men and women can do when considering whether sex constitutes a "bona fide occupational qualification" for a given position while nonetheless recognizing that those same prejudices have practical effects that would substantially burden Rost's religious practice (i.e., the operation of his business) in this case.  But the Ninth Circuit rejected similar reasoning in *Fernandez*, and we reject it here.  In *Fernandez*, the Ninth Circuit held that customer preferences could not transform a person's gender into a relevant consideration for a particular position *even if* the record supported the idea that the employer's business would suffer from promoting a woman because a large swath of clients would refuse to work with a female vice-president.  *See* 653 F.2d at 1276–77.  Just as the *Fernandez* court refused to treat discriminatory promotion practices as critical to an employer's business, notwithstanding any evidence to that effect in the record, so too we refuse to treat discriminatory policies as essential to Rost's business—or, by association, his religious exercise.

The Funeral Home's second alleged burden also fails.  Under *Holt v. Hobbs*, 135 S. Ct. 853 (2015), a government action that "puts [a religious practitioner] to th[e] choice" of "'engag[ing] in conduct that seriously violates [his] religious beliefs' [or] . . . fac[ing] serious" consequences constitutes a substantial burden for the purposes of RFRA.  *See id.* at 862 (quoting *Hobby Lobby*, 134 S. Ct. at 2775).  Here, Rost contends that he is being put to such a choice, as he either must "purchase female attire" for Stephens or authorize her "to dress in female attire *while representing* [the Funeral Home] and serving the bereaved," which purportedly violates Rost's religious beliefs, or else face "significant[] pressure . . . to leave the funeral industry and

end his ministry to grieving people." Appellee Br. at 38–39 (emphasis in original). Neither of these purported choices can be considered a "substantial burden" under RFRA.

First, though Rost currently provides his male employees with suits and his female employees with stipends to pay for clothing, this benefit is not legally required and Rost does not suggest that the benefit is religiously compelled. *See* Appellant Br. at 49 ("[T]he EEOC's suit would require only that *if* Rost provides a clothing benefit to his male employees, he provide a comparable benefit (which could be in-kind, or in cash) to his female employees."); R. 54-2 (Rost Aff.) (Page ID 1326–37) (no suggestion that clothing benefit is religiously motivated). In this regard, Rost is unlike the employers in *Hobby Lobby*, who rejected the idea that they could simply refuse to provide health care altogether and pay the associated penalty (which would allow them to avoid providing access to contraceptives in violation of their beliefs) because they felt religiously compelled to provide their employees with health insurance. *See* 134 S. Ct. at 2776. And while "it is predictable that the companies [in *Hobby Lobby*] would face a competitive disadvantage in retaining and attracting skilled workers" if they failed to provide health insurance, *id.* at 2777, the record here does not indicate that the Funeral Home's clothing benefit is necessary to attract workers; in fact, until the EEOC commenced the present action, the Funeral Home did not provide any sort of clothing benefit to its female employees. Thus, Rost is not being forced to choose between providing Stephens with clothing or else leaving the business; this is a predicament of Rost's own making.

Second, simply permitting Stephens to wear attire that reflects a conception of gender that is at odds with Rost's religious beliefs is not a substantial burden under RFRA. We presume that the "line [Rost] draw[s]"—namely, that permitting Stephens to represent herself as a woman would cause him to "violate God's commands" because it would make him "directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift," R. 54-2 (Rost Aff. ¶¶ 43, 45) (Page ID #1334–35)—constitutes "an honest conviction." *See Hobby Lobby*, 134 S. Ct. at 2779 (quoting *Thomas*, 450 U.S. at 716). But we hold that, as a matter of law, tolerating Stephens's understanding of her sex and gender identity is not tantamount to supporting it.

Most circuits, including this one, have recognized that a party can sincerely believe that he is being coerced into engaging in conduct that violates his religious convictions without actually, as a matter of law, being so engaged. Courts have recently confronted this issue when non-profit organizations whose religious beliefs prohibit them "from paying for, providing, or facilitating the distribution of contraceptives," or in any way "be[ing] complicit in the provision of contraception" argued that the Affordable Care Act's opt-out procedure—which enables organizations with religious objections to the contraceptive mandate to avoid providing such coverage by either filling out a form certifying that they have a religious objection to providing contraceptive coverage or directly notifying the Department of Health and Human Services of the religious objection—substantially burdens their religious practice. *See Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1132–33, 1143 (11th Cir. 2016).

Eight of the nine circuits to review the issue, including this court, have determined that the opt-out process does not constitute a substantial burden. *See id.* at 1141 (collecting cases); *see also Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*, 807 F.3d 738 (6th Cir. 2015), *cert. granted, judgment vacated sub nom. Mich. Catholic Conf. v. Burwell*, 136 S. Ct. 2450 (2016).[9] The courts reached this conclusion by examining the Affordable Care Act's provisions and determining that it was the statute—and not the employer's act of opting out—that "entitle[d] plan participants and beneficiaries to contraceptive coverage." *See, e.g., Eternal Word*, 818 F.3d at 1148–49. As a result, the employers' engagement with the opt-out process, though legally significant in that it leads the government to provide the organizations' employees with access to contraceptive coverage through an alternative route, does not mean the employers are facilitating the provision of contraceptives in a way that violates their religious practice. *See id.*

We view the Funeral Home's compliance with antidiscrimination laws in much the same light. Rost may sincerely believe that, by retaining Stephens as an employee, he is supporting and endorsing Stephens's views regarding the mutability of sex. But as a matter of law, bare

---

[9]Though a number of these decisions have been vacated on grounds that are not relevant to this case, their reasoning remains useful here.

compliance with Title VII—without actually assisting or facilitating Stephens's transition efforts—does not amount to an endorsement of Stephens's views. As much is clear from the Supreme Court's Free Speech jurisprudence, in which the Court has held that a statute requiring law schools to provide military and nonmilitary recruiters an equal opportunity to recruit students on campus was not improperly compelling schools to endorse the military's policies because "[n]othing about recruiting suggests that law schools agree with any speech by recruiters," and "students can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so, pursuant to an equal access policy." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) (citing *Bd. of Ed. of Westside Cmty. Schs. (Dist. 66) v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion)); *see also Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841–42 (1995) (being required to provide funds on an equal basis to religious as well as secular student publications does not constitute state university's support for students' religious messages). Similarly, here, requiring the Funeral Home to refrain from firing an employee with different religious views from Rost does not, as a matter of law, mean that Rost is endorsing or supporting those views. Indeed, Rost's own behavior suggests that he sees the difference between employment and endorsement, as he employs individuals of any or no faith, "permits employees to wear Jewish head coverings for Jewish services," and "even testified that he is *not* endorsing his employee's religious beliefs by employing them." Appellant Reply Br. at 18–19 (citing R. 61 (Def.'s Counter Statement of Disputed Facts ¶¶ 31, 37, 38) (Page ID #1834–36); R. 51-3 (Rost Dep. at 41–42) (Page ID #653)).[10]

At bottom, the fact that Rost sincerely believes that he is being compelled to make such an endorsement does not make it so. *Cf. Eternal Word*, 818 F.3d at 1145 ("We reject a framework that takes away from courts the responsibility to decide what action the government requires and leaves that answer entirely to the religious adherent. Such a framework improperly

---

[10]Even ignoring any adverse inferences that might be drawn from the incongruity between Rost's earlier deposition testimony and the Funeral Home's current litigation position, as we must do when considering whether summary judgment is appropriate in the EEOC's favor, we conclude as a matter of law that Rost does not express "support[] [for] the idea that sex is a changeable social construct rather than an immutable God-given gift" by continuing to hire Stephens, *see* R. 54-2 (Rost Aff. ¶¶ 43, 45) (Page ID #1334–35)—even if Rost sincerely believes otherwise.

substitutes religious belief for legal analysis regarding the operation of federal law."). Accordingly, requiring Rost to comply with Title VII's proscriptions on discrimination does not substantially burden his religious practice.  The district court therefore erred in granting summary judgment to the Funeral Home on the basis of its RFRA defense, and we **REVERSE** the district court's decision on this ground.  As Rost's purported burdens are insufficient as a matter of law, we **GRANT** summary judgment to the EEOC with respect to the Funeral Home's RFRA defense.

### iii.  Strict Scrutiny Test

Because the Funeral Home has not established that Rost's religious exercise would be substantially burdened by requiring the Funeral Home to comply with Title VII, we do not need to consider whether the EEOC has adequately demonstrated that enforcing Title VII in this case is the least restrictive means of furthering a compelling government interest.  However, in the interest of completeness, we reach this issue and conclude that the EEOC has satisfied its burden. We therefore **GRANT** summary judgment to the EEOC with regard to the Funeral Home's RFRA defense on the alternative grounds that the EEOC's enforcement action in this case survives strict scrutiny.

### (a)  Compelling Government Interest

Under the "to the person" test, the EEOC must demonstrate that its compelling interest "is satisfied through application of the challenged law [to] . . . the particular claimant whose sincere exercise of religion is being substantially burdened."  *Gonzales*, 546 U.S. at 430–31 (citing 42 U.S.C. § 2000bb–1(b)).  This requires "look[ing] beyond broadly formulated interests justifying the general applicability of government mandates and scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants."  *Id.* at 431.

As an initial matter, the Funeral Home does not seem to dispute that the EEOC "has a compelling interest in the 'elimination of workplace discrimination, including sex

discrimination.'"  Appellee Br. at 41 (quoting Appellant Br. at 51).[11]  However, the Funeral Home criticizes the EEOC for "cit[ing] a general, broadly formulated interest" to support enforcing Title VII in this case.  *Id.*  According to the Funeral Home, the relevant inquiry is whether the EEOC has a "specific interest in forcing [the Funeral Home] to allow its male funeral directors to wear the uniform for female funeral directors while on the job."  *Id.*  The EEOC instead asks whether its interest in "eradicating employment discrimination" is furthered by ensuring that Stephens does not suffer discrimination (either on the basis of sex-stereotyping or her transgender status), lose her livelihood, or face the emotional pain and suffering of being effectively told "that as a transgender woman she is not valued or able to make workplace contributions."  Appellant Br. at 52, 54 (citing *Lusardi v. McHugh*, EEOC DOC 0120133395, 2015 WL 1607756, at *1 (E.E.O.C. Apr. 1, 2015)).  Stephens similarly argues that "Title VII serves a compelling interest in eradicating all the forms of invidious employment discrimination proscribed by the statute," and points to studies demonstrating that transgender people have experienced particularly high rates of "bodily harm, violence, and discrimination because of their transgender status."  Intervenor Br. at 21, 23–25.

The Funeral Home's construction of the compelling-interest test is off-base.  Rather than focusing on the EEOC's claim—that the Funeral Home terminated Stephens because of her proposed gender nonconforming behavior—the Funeral Home's test focuses instead on its defense (discussed above) that the Funeral Home merely wishes to enforce an appropriate workplace uniform.  But the Funeral Home has not identified any cases where the government's compelling interest was framed as its interest in disturbing a company's workplace policies.  For instance, in *Hobby Lobby*, the issue, which the Court ultimately declined to adjudicate, was whether the government's "interest in guaranteeing cost-free access to the four challenged contraceptive methods" was compelling—not whether the government had a compelling interest in requiring closely held organizations to act in a way that conflicted with their religious practice.  *See* 134 S. Ct. at 2780.

---

[11]While the district court did not hold that the EEOC had conclusively established the "compelling interest" element of its opposition to the Funeral Home's RFRA defense, it assumed so arguendo.  *See R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 857–59.

The Supreme Court's analysis in cases like *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Holt* guides our approach. In those cases, the Court ultimately determined that the interests *generally* served by a given government policy or statute would not be "compromised" by granting an exemption to a particular individual or group. *See Holt*, 135 S. Ct. at 863. Thus, in *Yoder*, the Court held that the interests furthered by the government's requirement of compulsory education for children through the age of sixteen (i.e., "to prepare citizens to participate effectively and intelligently in our open political system" and to "prepare[] individuals to be self-reliant and self-sufficient participants in society") were not harmed by granting an exemption to the Amish, who do not need to be prepared "for life in modern society" and whose own traditions adequately ensure self-sufficiency. 406 U.S. at 221–22. Similarly, in *Holt*, the Court recognized that the Department of Corrections has a compelling interest in preventing prisoners from hiding contraband on their persons, which is generally effectuated by requiring prisoners to adhere to a strict grooming policy, but the Court failed to see how the Department's "compelling interest in staunching the flow of contraband into and within its facilities . . . would be seriously compromised by allowing an inmate to grow a ½-inch beard." 135 S. Ct. at 863.

Here, the same framework leads to the opposite conclusion. Failing to enforce Title VII against the Funeral Home means the EEOC would be allowing a particular person—Stephens—to suffer discrimination, and such an outcome is directly contrary to the EEOC's compelling interest in combating discrimination in the workforce. *See, e.g.*, *United States v. Burke*, 504 U.S. 229, 238 (1992) ("[I]t is beyond question that discrimination in employment on the basis of sex . . . is, as . . . this Court consistently has held, an invidious practice that causes grave harm to its victims.").[12] In this regard, this case is analogous to *Eternal Word*, in which the Eleventh Circuit determined that the government had a compelling interest in requiring a particular nonprofit

---

[12]Courts have repeatedly acknowledged that Title VII serves a compelling interest in eradicating all forms of invidious employment discrimination proscribed by the statute. *See, e.g.*, *EEOC v. Miss. Coll.*, 626 F.2d 477, 488–89 (5th Cir. 1980). As the Supreme Court stated, the "stigmatizing injury" of discrimination, "and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their sex as by those treated differently because of their race." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984); *see also EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a 'highest priority.' Congress' purpose to end discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions."), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991).

No. 16-2424          *EEOC v. R.G. & G.R. Harris Funeral Homes*          Page 38

organization with religious objections to the Affordable Care Act's contraceptive mandate to follow the procedures associated with obtaining an accommodation to the Act because

> applying the accommodation procedure *to the plaintiffs in these cases* furthers [the government's] interests because the accommodation ensures that the plaintiffs' female plan participants and beneficiaries—who may or may not share the same religious beliefs as their employer—have access to contraception without cost sharing or additional administrative burdens as the ACA requires.

818 F.3d at 1155 (emphasis added). The *Eternal Word* court reasoned that "[u]nlike the exception made in *Yoder* for Amish children," who would be adequately prepared for adulthood even without compulsory education, the "poor health outcomes related to unintended or poorly timed pregnancies apply to the plaintiffs' female plan participants or beneficiaries and their children just as they do to the general population." *Id.* Similarly, here, the EEOC's compelling interest in eradicating discrimination applies with as much force to Stephens as to any other employee discriminated against based on sex.

It is true, of course, that the specific harms the EEOC identifies in this case, such as depriving Stephens of her livelihood and harming her sense of self-worth, are simply permutations of the generic harm that is always suffered in employment discrimination cases. But *O Centro*'s "to the person" test does not mean that the government has a compelling interest in enforcing the laws only when the failure to enforce would lead to uniquely harmful consequences. Rather, the question is whether "the asserted harm of granting specific exemptions to particular religious claimants" is sufficiently great to require compliance with the law. *O Centro*, 546 U.S. at 431. Here, for the reasons stated above, the EEOC has adequately demonstrated that Stephens has and would suffer substantial harm if we exempted the Funeral Home from Title VII's requirements.

Finally, we reject the Funeral Home's claim that it should receive an exemption, notwithstanding any harm to Stephens or the EEOC's interest in eradicating discrimination, because "the constitutional guarantee of free exercise[,] effectuated here via RFRA . . . [,] is a higher-order right that necessarily supersedes a conflicting statutory right," Appellee Br. at 42. This point warrants little discussion. The Supreme Court has already determined that RFRA does not, in fact, "effectuate . . . the First Amendment's guarantee of free exercise," *id.*, because

it sweeps more broadly than the Constitution demands. *See Boerne*, 521 U.S. at 532. And in any event, the Supreme Court has expressly recognized that compelling interests can, at times, override religious beliefs—even those that are squarely protected by the Free Exercise Clause. *See Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests."). We therefore decline to hoist automatically Rost's religious interests above other compelling governmental concerns. The undisputed record demonstrates that Stephens has been and would be harmed by the Funeral Home's discriminatory practices in this case, and the EEOC has a compelling interest in eradicating and remedying such discrimination.

### (b) Least Restrictive Means

The final inquiry under RFRA is whether there exist "other means of achieving [the government's] desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 134 S. Ct. at 2780 (citing 42 U.S.C. §§ 2000bb-1(a), (b)). "The least-restrictive-means standard is exceptionally demanding," *id.* (citing *Boerne*, 521 U.S. at 532), and the EEOC bears the burden of showing that burdening the Funeral Home's religious exercise constitutes the least restrictive means of furthering its compelling interests, *see id.* at 2779. Where an alternative option exists that furthers the government's interest "equally well," *see id.* at 2782, the government "must use it," *Holt*, 135 S. Ct. at 864 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)). In conducting the least-restrictive-alternative analysis, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries." *Hobby Lobby*, 134 S. Ct. at 2781 n.37 (quoting *Cutter,* 544 U.S. at 720). Cost to the government may also be "an important factor in the least-restrictive-means analysis." *Id.* at 2781.

The district court found that requiring the Funeral Home to adopt a gender-neutral dress code would constitute a less restrictive alternative to enforcing Title VII in this case, and granted the Funeral Home summary judgment on this ground. According to the district court, the Funeral Home engaged in illegal sex stereotyping only with respect to "the clothing Stephens

[c]ould wear at work," and therefore a gender-neutral dress code would resolve the case because Stephens would not be forced to dress in a way that conforms to Rost's conception of Stephens's sex and Rost would not be compelled to authorize Stephens to dress in a way that violates Rost's religious beliefs. *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 861, 863.

Neither party endorses the district court's proposed alternative, and for good reason. The district court's suggestion, although appealing in its tidiness, is tenable only if we excise from the case evidence of sex stereotyping in areas other than attire. Though Rost does repeatedly say that he terminated Stephens because she "wanted to *dress* as a woman" and "would no longer *dress* as a man," *see* R. 54-5 (Rost 30(b)(6) Dep. at 136–37) (Page ID #1372) (emphasis added), the record also contains uncontroverted evidence that Rost's reasons for terminating Stephens extended to other aspects of Stephens's intended presentation. For instance, Rost stated that he fired Stephens because Stephens "was no longer going to *represent himself* as a man," *id.* at 136 (Page ID #1372) (emphasis added), and Rost insisted that Stephens presenting as a female would disrupt clients' healing process because female clients would have to "share a bathroom with a man dressed up as a woman," *id.* at 74, 138–39 (Page ID #1365, 1373). The record thus compels the finding that Rost's concerns extended beyond Stephens's attire and reached Stephens's appearance and behavior more generally.

At the summary-judgment stage, where a court may not "make credibility determinations, weigh the evidence, or draw [adverse] inferences from the facts," *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986)), the district court was required to account for the evidence of Rost's non-clothing-based sex stereotyping in determining whether a proposed less restrictive alternative furthered the government's "stated interests equally [as] well," *Hobby Lobby*, 134 S. Ct. at 2782. Here, as the evidence above shows, merely altering the Funeral Home's dress code would not address the discrimination Stephens faced because of her broader desire "to represent [her]self as a [wo]man." R. 54-5 (Rost 30(b)(6) Dep. at 136) (Page ID #1372). Indeed, the Funeral Home's counsel conceded at oral argument that Rost would have objected to Stephens's coming "to work presenting clearly as a woman and acting as a woman," regardless of whether

Stephens wore a man's suit, because that "would contradict [Rost's] sincerely held religious beliefs." *See* Oral Arg. at 46:50–47:46.

The Funeral Home's proposed alternative—to "permit businesses to allow the enforcement of sex-specific dress codes for employees who are public-facing representatives of their employer, so long as the dress code imposes equal burdens on the sexes and does not affect employee dress outside of work," Appellee Br. at 44–45—is equally flawed. The Funeral Home's suggestion would do nothing to advance the government's compelling interest in preventing and remedying discrimination against Stephens based on her refusal to conform at work to stereotypical notions of how biologically male persons should dress, appear, behave, and identify. Regardless of whether the EEOC has a compelling interest in combating sex-specific dress codes—a point that is not at issue in this case—the EEOC does have a compelling interest in ensuring that the Funeral Home does not discriminate against its employees on the basis of their sex. The Funeral Home's proposed alternative sidelines this interest entirely.[13]

The EEOC, Stephens, and several amici argue that searching for an alternative to Title VII is futile because enforcing Title VII is itself the least restrictive way to further EEOC's interest in eradicating discrimination based on sex stereotypes from the workplace. *See, e.g.*, Appellant Br. at 55–61; Intervenor Br. at 27–33. We agree.

To start, the Supreme Court has previously acknowledged that "there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA." *O Centro*, 546 U.S. at 436. The Court highlighted *Braunfeld v. Brown*, 366 U.S. 599 (1961), as an example of a case where the "need for uniformity" trumped "claims for religious exemptions." *O Centro*, 546 U.S. at 435. In *Braunfeld*, the plurality "denied a claimed

---

[13]In its district court briefing, the Funeral Home proposed three additional purportedly less restrictive alternatives: the government could hire Stephens; the government could pay Stephens a full salary and benefits until she secures comparable employment; or the government could provide incentives to other employers to hire Stephens and allow her to dress as she pleases. R. 67 (Def.'s Reply Mem. of Law in Support of Def.'s Mot. for Summ. J. at 17–18) (Page ID #2117–18). Not only do these proposals fail to further the EEOC's interest enabling Stephens to work for the Funeral Home without facing discrimination, but they also fail to consider the cost to the government, which is "an important factor in the least-restrictive-means analysis." *Hobby Lobby*, 134 S. Ct. at 2781. We agree with the EEOC that the Funeral Home's suggestions—which it no longer pushes on appeal—are not viable alternatives to enforcing Title VII in this case, as they do not serve the EEOC's interest in eradicating discrimination "equally well." *See id.* at 2782.

exception to Sunday closing laws, in part because . . . [t]he whole point of a 'uniform day of rest for all workers' would have been defeated by exceptions." *O Centro*, 546 U.S. at 435 (quoting *Sherbert*, 374 U.S. at 408 (discussing *Braunfeld*)).  *Braunfeld* thus serves as a particularly apt case to consider here, as it too concerned an attempt by an employer to seek an exemption that would elevate its religious practices above a government policy designed to benefit employees. If the government's interest in a "uniform day of rest for all workers" is sufficiently weighty to preclude exemptions, *see O Centro*, 546 U.S. at 435, then surely the government's interest in uniformly eradicating discrimination against employees exerts just as much force.

The Court seemingly recognized Title VII's ability to override RFRA in *Hobby Lobby*, as the majority opinion stated that its decision should not be read as providing a "shield" to those who seek to "cloak[] as religious practice" their efforts to engage in "discrimination in hiring, for example on the basis of race."  134 S. Ct. at 2783.  As the *Hobby Lobby* Court explained, "[t]he Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal." *Id.*  We understand this to mean that enforcement actions brought under Title VII, which aims to "provid[e] an equal opportunity to participate in the workforce without regard to race" and an array of other protected traits, *see id.*, will necessarily defeat RFRA defenses to discrimination made illegal by Title VII.  The district court reached the opposite conclusion, reasoning that *Hobby Lobby* did not suggest that "a RFRA defense can never prevail as a defense to Title VII" because "[i]f that were the case, the majority would presumably have said so." *R.G. & G.R. Harris Funeral Homes, Inc.*, 201 F. Supp. 3d at 857. But the majority *did* say that anti-discrimination laws are "precisely tailored" to achieving the government's "compelling interest in providing an equal opportunity to participate in the workforce" without facing discrimination. *Hobby Lobby*, 134 S. Ct. at 2783.

As Stephens notes, at least two district-level federal courts have also concluded that Title VII constitutes the least restrictive means for eradicating discrimination in the workforce. *See Redhead v. Conf. of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 222 (E.D.N.Y. 2006) (holding that "the Title VII framework is the least restrictive means of furthering" the government's interest in avoiding discrimination against non-ministerial employees of religious organization),

*adhered to on reconsideration*, 566 F. Supp. 2d 125 (E.D.N.Y. 2008); *EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 810–11 (S.D. Ind. 2002) ("[I]n addition to finding that the EEOC's intrusion into [the defendant's] religious practices is pursuant to a compelling government interest,"—i.e., "the eradication of employment discrimination based on the criteria identified in Title VII"—"we also find that the intrusion is the least restrictive means that Congress could have used to effectuate its purpose.").

We also find meaningful Congress's decision not to include exemptions within Title VII to the prohibition on sex-based discrimination. As both the Supreme Court and other circuits have recognized, "[t]he very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 475 (5th Cir. 2014) (citing *Hobby Lobby*, 134 S. Ct. at 2781–82; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" (omission in original) (quoting *Fla. Star v. B.J.F.*, 491 U.S. 524, 541–42 (1989) (Scalia, J., concurring))). Indeed, a driving force in the *Hobby Lobby* Court's determination that the government had failed the least-restrictive-means test was the fact that the Affordable Care Act, which the government sought to enforce in that case against a closely held organization, "already established an accommodation for nonprofit organizations with religious objections." *See* 134 S. Ct. at 2782. Title VII, by contrast, does not contemplate any exemptions for discrimination on the basis of sex. Sex may be taken into account only if a person's sex "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise," 42 U.S.C. § 2000e-2(e)(1)—and in that case, the preference is no longer discriminatory in a malicious sense. Where the government has developed a comprehensive scheme to effectuate its goal of eradicating discrimination based on sex, including sex stereotypes, it makes sense that the only way to achieve the scheme's objectives is through its enforcement.

State courts' treatment of RFRA-like challenges to their own antidiscrimination laws is also telling. In several instances, state courts have concluded that their respective antidiscrimination laws survive strict scrutiny, such that religious claimants are not entitled to exemptions to enforcement of the state prohibitions on discrimination with regard to housing, employment, medical care, and education. *See State v. Arlene's Flowers, Inc.*, 389 P.3d 543, 565–66 (Wash. 2017) (collecting cases), *petition for cert. filed Arlene's Flowers, Inc. v. Washington*, 86 U.S.L.W. 3047 (U.S. July 14, 2017) (No. 17-108). These holdings support the notion that antidiscrimination laws allow for fewer exceptions than other generally applicable laws.

As a final point, we reject the Funeral Home's suggestion that enforcing Title VII in this case would undermine, rather than advance, the EEOC's interest in combating sex stereotypes. According to the Funeral Home, the EEOC's requested relief reinforces sex stereotypes because the agency essentially asks that Stephens "be able to dress in a stereotypical feminine manner." *R.G. & G.R. Funeral Homes, Inc.*, 201 F. Supp. 3d at 863 (emphasis omitted). This argument misses the mark. Nothing in Title VII or this court's jurisprudence requires employees to reject their employer's stereotypical notions of masculinity or femininity; rather, employees simply may not be discriminated against for a failure to conform. *See Smith*, 378 F.3d at 572 (holding that a plaintiff makes out a prima facie case for discrimination under Title VII when he pleads that "his *failure to conform* to sex stereotypes concerning how a man should look and behave was the driving force behind" an adverse employment action (emphasis added)). Title VII protects both the right of male employees "to c[o]me to work with makeup or lipstick on [their] face[s]," *Barnes*, 401 F.3d at 734, and the right of female employees to refuse to "wear dresses or makeup," *Smith*, 378 F.3d at 574, without any internal contradiction.

In short, the district court erred in finding that EEOC had failed to adopt the least restrictive means of furthering its compelling interest in eradicating discrimination in the workplace. Thus, even if we agreed with the Funeral Home that Rost's religious exercise would be substantially burdened by enforcing Title VII in this case, we would nevertheless **REVERSE** the district court's grant of summary judgment to the Funeral Home and hold instead that requiring the Funeral Home to comply with Title VII constitutes the least restrictive means of

furthering the government's compelling interest in eradicating discrimination against Stephens on the basis of sex. Thus, even assuming Rost's religious exercise is substantially burdened by the EEOC's enforcement action in this case, we **GRANT** summary judgment to the EEOC on the Funeral Home's RFRA defense on this alternative ground.

## C. Clothing-Benefit Discrimination Claim

The district court erred in granting summary judgment in favor of the Funeral Home on the EEOC's discriminatory clothing-allowance claim. We long ago held that the scope of the complaint the EEOC may file in federal court in its efforts to enforce Title VII is "limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *EEOC v. Bailey Co.*, 563 F.2d 439, 446 (6th Cir. 1977) (quoting inter alia, *Tipler v. E. I. duPont deNemours & Co.*, 443 F.2d 125, 131 (6th Cir. 1971)), *disapproved of on other grounds by Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978)). The EEOC now urges us to hold that *Bailey* is incompatible with subsequent Supreme Court precedent and therefore no longer binding on this court. Because we believe that the EEOC may properly bring a clothing-allowance claim under *Bailey*, we need not decide whether *Bailey* has been rendered obsolete.

In *Bailey*, a white female employee charged that her employer failed to promote her on account of her sex, generally failed to promote women because of their sex, failed to pay equally qualified women as well as men, and failed to recruit and hire black women because of their race. *Id.* at 442. While investigating these claims, the EEOC found there was no evidence to support the complainant's charges of sex discrimination, but there was reasonable cause to believe the company had racially discriminatory hiring and promotion practices. In addition, the EEOC learned that the employer had seemingly refused to hire one applicant on the basis of his religion. After failed efforts at conciliation, the EEOC initiated a lawsuit against the employer alleging both racial and religious discrimination. We held that the EEOC lacked authority to bring an enforcement action regarding alleged religious discrimination because "[t]he portion of the EEOC's complaint incorporating allegations of religious discrimination exceeded the scope of the EEOC investigation of [the defendant employer] reasonably expected to grow out of [the original] charge of sex and race discrimination." *Id.* at 446. We determined, however, that the

EEOC was authorized to bring race discrimination claims against the employer because the original charge alleged racial discrimination against black applicants and employees and the charging party—a white woman—had standing under Title VII to file such a charge with the EEOC because she "may have suffered from the loss of benefits from the lack of association with racial minorities at work." *Id.* at 452 (citations omitted).

As we explained in *Bailey*, the EEOC may sue for matters beyond those raised directly in the EEOC's administrative charge for two reasons. First, limiting the EEOC complaint to the precise grounds listed in the charge of discrimination would undercut Title VII's "effective functioning" because laypersons "who are unfamiliar with the niceties of pleading and are acting without the assistance of counsel" submit the original charge. *Id.* at 446 (quoting *Tipler*, 443 F.2d at 131). Second, an initial charge of discrimination does not trigger a lawsuit; it instead triggers an EEOC investigation. The matter evolves into a lawsuit only if the EEOC is unable "to obtain voluntary compliance with the law. . . . Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation." *Id.* at 447 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970)).

At the same time, however, we concluded in *Bailey* that allowing the EEOC to sue for matters beyond those reasonably expected to arise from the original charge would undermine Title VII's enforcement process. In particular, we understood that an original charge provided an employer with "notice of the allegation, an opportunity to participate in a complete investigation of such allegation, and an opportunity to participate in meaningful conciliation discussions should reasonable cause be found following the EEOC investigation." *Id.* at 448. We believed that the full investigatory process would be short-circuited, and the conciliation process thereby threatened, if the EEOC did not file a separate charge and undertake a separate investigation when facts are learned suggesting an employer may have engaged in "discrimination of a type other than that raised by the individual party's charge and unrelated to the individual party." *Id.*

The EEOC now insists that *Bailey* is no longer good law after the Supreme Court's decision in *General Telephone Company of the Northwest, Inc. v. EEOC*, 446 U.S. 318 (1980). In *General Telephone*, the Supreme Court held that Rule 23 of the Federal Rules of Civil

Procedure, which governs class actions, does not apply to enforcement actions initiated by the EEOC. *Id.* at 331. As part of its reasoning, the Court found that various requirements of Rule 23—such as the requirement that "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class," FED. R. CIV. P. 23(a)(3)—are incompatible with the EEOC's enforcement responsibilities under Title VII:

> The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims. If Rule 23 were applicable to EEOC enforcement actions, it would seem that the Title VII counterpart to the Rule 23 named plaintiff would be the charging party, with the EEOC serving in the charging party's stead as the representative of the class. Yet the Courts of Appeals have held that EEOC enforcement actions are not limited to the claims presented by the charging parties. Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable. The latter approach is far more consistent with the EEOC's role in the enforcement of Title VII than is imposing the strictures of Rule 23, which would limit the EEOC action to claims typified by those of the charging party.

*Gen. Tel.*, 446 U.S. at 330–31 (internal citations omitted). The EEOC argues that this passage directly contradicts the holding in *Bailey*, in which we rejected the EEOC's argument that it "can investigate evidence of any other discrimination called to its attention during the course of an investigation." *See* 563 F.2d at 446.

Though there may be merit to the EEOC's argument, *see EEOC v. Kronos Inc.*, 620 F.3d 287, 297 (3d Cir. 2010) (citing *General Telephone* for the proposition that "[o]nce the EEOC begins an investigation, it is not required to ignore facts that support additional claims of discrimination if it uncovers such evidence during the course of a reasonable investigation of the charge" (citing *Gen. Tel.*, 446 U.S. at 331)), we need not resolve *Bailey*'s compatibility with *General Telephone* at this time because our holding in *Bailey* does not preclude the EEOC from bringing a clothing-allowance-discrimination claim in this case.

First, the present case is factually distinguishable from *Bailey*. In *Bailey*, the court determined that allegations of religious discrimination were outside the scope of an investigation "reasonably related" to the original charge of sex and race discrimination because, in part, "[t]he evidence presented at trial by the EEOC to support its allegations of religious discrimination did not involve practices affecting [the original charger]." 563 F.2d at 447. Here, by contrast,

Stephens would have been directly affected by the Funeral Home's allegedly discriminatory clothing-allowance policy had she not been terminated, as the Funeral Home's current practice indicates that she would have received either no clothing allowance or a less valuable clothing allowance once she began working at the Funeral Home as a woman.[14] And, unlike the EEOC's investigation of religious discrimination in *Bailey*, the EEOC's investigation into the Funeral Home's discriminatory clothing-allowance policy concerns precisely the same type of discrimination—discrimination on the basis of sex—that Stephens raised in her initial charge.

Second, we have developed a broad conception of the sorts of claims that can be "reasonably expected to grow out of the initial charge of discrimination." *See Bailey*, 563 F.2d at 446. As we explained in *Davis v. Sodexho*, 157 F.3d 460 (6th Cir. 1998), "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Id.* at 463. And we have also cautioned that "EEOC charges must be liberally construed to determine whether . . . there was information given in the charge that reasonably should have prompted an EEOC investigation of [a] separate type of discrimination." *Leigh v. Bur. of State Lottery*, 1989 WL 62509, at *3 (6th Cir. June 13, 1989) (Table) (citing *Bailey*, 563 F.2d at 447). Here, Stephens alleged that she was fired after she shared her intention to present and dress as a woman because the Funeral Home "management [told her that it] did not believe the public would be accepting of [her] transition" from male to female. R. 63-2 (Charge of Discrimination at 1) (Page ID #1952). It was reasonable to expect, in light of this allegation, that the EEOC would investigate the Funeral Home's employee-appearance requirements and expectations, would learn about the Funeral Home's sex-specific dress code, and would thereby uncover the Funeral Home's seemingly discriminatory clothing-allowance policy. As much is clear from our decision in *Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (6th Cir. 1981), in which "we held that the plaintiffs could bring equal pay claims alleging that their union discriminated in negotiating pay scales for different job designations, despite the fact that the plaintiffs' EEOC charge alleged only that the union failed to represent them in securing the higher paying job designations."

---

[14]The Funeral Home insists that it would provide female funeral directors with a company-issued suit if it had any female Funeral Directors. *See* R. 53-3 (Rost Aff. ¶ 54) (Page ID #939). This is a factual claim that we cannot credit at the summary-judgment stage.

*Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002) (citing *Farmer*, 660 F.2d at 1105). As we recognized then, underlying the *Farmer* plaintiffs' claim was an implicit allegation that the plaintiffs were as qualified and responsible as the higher-paid employees, and this fact "could reasonably be expected to lead the EEOC to investigate why different job designations that required the same qualifications and responsibilities used disparate pay scales." *Id.* By the same token, Stephens's claim that she was fired because of her planned change in appearance and presentation contains an implicit allegation that the Funeral Home requires its male and female employees to look a particular way, and this fact could (and did) reasonably prompt the EEOC to investigate whether these appearance requirements imposed unequal burdens—in this case, fiscal burdens—on its male and female employees.

We therefore **REVERSE** the district court's grant of summary judgment to the Funeral Home on the EEOC's discriminatory-clothing-allowance claim and **REMAND** with instructions to consider the merits of the EEOC's claim.

### III. CONCLUSION

Discrimination against employees, either because of their failure to conform to sex stereotypes or their transgender and transitioning status, is illegal under Title VII. The unrefuted facts show that the Funeral Home fired Stephens because she refused to abide by her employer's stereotypical conception of her sex, and therefore the EEOC is entitled to summary judgment as to its unlawful-termination claim. RFRA provides the Funeral Home with no relief because continuing to employ Stephens would not, as a matter of law, substantially burden Rost's religious exercise, and even if it did, the EEOC has shown that enforcing Title VII here is the least restrictive means of furthering its compelling interest in combating and eradicating sex discrimination. We therefore **REVERSE** the district court's grant of summary judgment in favor of the Funeral Home and **GRANT** summary judgment to the EEOC on its unlawful-termination claim. We also **REVERSE** the district court's grant of summary judgment on the EEOC's discriminatory-clothing-allowance claim, as the district court erred in failing to consider the EEOC's claim on the merits. We **REMAND** this case to the district court for further proceedings consistent with this opinion.